IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

LUBBOCK DIVISION

| | | |
|---|---|---|
| SALTY BRINE I, LTD., by and through<br>SALTY BRINE, INC., Tax Matters Partner,<br>et al., | ) <br> ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | Civil Action No. 5:10-CV-108-C<br>(consolidated with 5:10-CV-109-C, |
| v. | ) <br> ) | 5:10-CV-110-C, 5:10-CV-111-C,<br>5:10-CV-161-C, 5:11-CV-137-C, |
| UNITED STATES OF AMERICA, | ) <br> ) | 5:12-CV-227-C, and 5:13-CV-014-C) |
| Defendant. | ) <br> ) | |

**ORDER**

    This tax case involves partnerships and corporations related to John Thomas of

Breckenridge, Texas, and Lee Kidd of Denver City, Texas.  The issues are (1) whether the

purchase of what Plaintiffs call Business Protection Policies resulted in ordinary and necessary

business expenses deductible under § 162 of the Internal Revenue Code; (2) whether the transfer

of certain overriding royalty interests by Plaintiff Thomas & Kidd Oil Production, Ltd. was an

invalid attempt to assign income that should have been taxed to that party; and (3) whether

Plaintiffs have a reasonable cause defense against the imposition of the penalties by the Internal

Revenue Service.

# I. FINDINGS OF FACT

**The BPP Transactions**

1.  The first of the primary transactions at issue in this case relates to Plaintiffs' purchase of Business Protection Policies ("BPPs").  These policies were issued by Fidelity Insurance Company and Citadel Insurance Company.

2.  Fidelity and Citadel were based offshore in the British West Indies.  Fidelity began selling BPPs in 2001.  Citadel began selling BPPs in 2005.  The tax year at issue, 2006, includes BPPs sold by both companies.

3.  Fidelity and Citadel were part of a larger group of entities affiliated with Alliance Holding Company, Ltd.  In addition to the insurance entities, the Alliance group included a trust company, First Fidelity Trust, as well as several other entities.  A U.S.-based administrative entity, Offshore Trust Services, provided certain administrative service for U.S. taxpayers that purchased BPPs and acted as an intermediary between the taxpayers and the offshore entities affiliated with Alliance.  Foster & Dunhill, a marketing firm, conducted programs at Caribbean locations to solicit customers for BPPs sold by Fidelity and Citadel.

4.  Duane Crithfield was director of the Alliance group and was involved in the management of every entity involved in the BPP operation except the marketing entity, Foster & Dunhill.  Stephen Donaldson controlled Foster & Dunhill.

### *Thomas and Kidd First Learned About BPP Transactions Through a Presentation Given to Their Accountant*

5.  The ultimate taxpayers, John Thomas and Lee Kidd, own and operate a group of oil and gas related businesses based in west Texas.

2

6. Thomas and Kidd first learned about BPPs through their accountant, H. Glenn Henderson, who was in turn introduced to the product in 2000 through a meeting with Donaldson. Donaldson marketed Fidelity's products.

7. Henderson was immediately interested in the cash-value life insurance products because Fidelity and Citadel offered their clients investment options not offered by domestic insurance companies.

8. Within a year, Henderson met with Donaldson again. This meeting focused on BPPs. Donaldson presented a Power Point presentation describing BPP goals and transaction steps.

9. The "strategic goals" presented included tax reductions and protection of assets from creditors:

- Reduce Business/Personal Income Tax;

- Reduce Capital Gains Tax;

- Provide Asset Protection;

- Create Tax Free Retirement Income.

10. To achieve these goals, the presentation included a number of steps that must be completed. First, the client settles an offshore "asset protection trust." Second, the client purchases cash-value life insurance policies. Next, the cash value of that life policy is allocated to "separate asset" accounts, which are invested in accordance with the client's instructions. Finally, the client purchases a BPP.

11. BPP risk is covered by the life policy's separate asset accounts. At the end of the BPP's one-year term, 85 percent of the BPP premium, plus a nominal amount of interest earned

at certificate of deposit rates, is transferred to the account. The presentation stressed that the BPP

risks are not pooled with other clients:

> Although the Separate Asset Accounts are pooled investments and
> have a common manager, the reinsurance risks are not. Therefore,
> as a safety feature, the profitability of each life policy's reinsurance
> business is tied to that client's company's non-life policies and to
> none other.

12. In essence, a client's separate asset accounts were responsible only for BPP claims

filed by that client's business. No third-party business had access to the client's accounts.

### Thomas and Kidd Began Purchasing Cash-Value Life Insurance Policies in 2002

13. Consistent with Donaldson's Power Point presentation, the transactions at issue

began and ended with cash-value life insurance policies.

14. Thomas and Kidd began purchasing cash-value policies from Fidelity in early 2002.

15. Thomas and Kidd did not own these life policies directly. Instead, they formed

offshore limited liability companies to directly own the policies: L&E Kidd LLC and J. Thomas

LLC. Both of these LLCs were formed in December 2001 under the laws of Nevis, British West

Indies. By 2006, the LLCs owned seven cash-value life policies.

16. The offshore LLCs were owned by two investment partnerships, Kiddel, Ltd. and

JTOM, Ltd. Those partnerships are owned by the Kidd Irrevocable Trust and the Thomas

Irrevocable Trust. Thomas and Kidd are trustees of the trusts, and their children are

beneficiaries.

17. The investments of each of these cash-value life policies were held in separate or

"segregated" accounts. The assets of these accounts were set aside and accounted for separately

from other insurance policies. The owners of other insurance policies and the creditors of the

4

insurance companies had no access or right to the assets in these segregated accounts. These accounts are sometimes referred to as "separate" accounts or "sole" accounts.

### Thomas and Kidd Purchased Cash-Value Life Insurance Policies to Receive the Anticipated Profits From Their Investment in BPPs

18. As explained in the Foster & Dunhill promotional materials, a party desiring to buy Fidelity's BPPs also had to purchase either cash-value life insurance or a variable rate annuity. These policies were a necessary part of the tax shelter scheme because they were to receive the "earnings" or profits from the BPP investment (premiums paid less Fidelity's 15 percent fee) at the end of the policy year. Thomas and Kidd followed the plan and purchased cash-value life policies that were in place by early 2002.

19. They made their first BPP purchases in late 2001 and began funneling their earnings into the life insurance policies at the end of the policy year in December 2002.

20. The only year at issue in this case is 2006.

21. The 2006 policies purportedly protected seven businesses owned and operated by Thomas and Kidd: Thomas & Kidd Oil Production, Ltd.; Salty Brine I, Ltd.; Delta Oil & Gas, Inc.; Del-Tex Hydrocarbons, Inc.; K&T Farm, Ltd.; Five Star Consolidated, Ltd.; and Wasson Solid Waste Disposal, Ltd. ("the Thomas and Kidd businesses"). These businesses operated oil and gas properties and provided a number of services related to the oil and gas industry.

22. As with the life insurance policies, Thomas and Kidd did not own their businesses directly. They were owned through the same trusts and investment partnerships that owned the life policies.

23. All of the Thomas and Kidd businesses except Thomas & Kidd Oil Production were owned by the Kidd Irrevocable Trust and the Thomas Irrevocable Trust. As with the life policies, the trusts owned the businesses through the investment partnerships, Kiddel and JTOM. The Kidd Trust owned 98.03 percent of Kiddel and the Thomas Trust owned 97.54 percent of JTOM. Thomas and Kidd managed JTOM and Kiddel through grantor trusts named the Kidd Management Trust and the Thomas Management Trust.

24. The exact ownership percentages varied for each business, and some of the businesses' ownership structures included minority interest holders. Five Star, for example, had a minority partner, M&H Well Service.

25. Thomas and Kidd owned the remaining business, Thomas & Kidd Oil Production, Ltd., through two grantor trusts and two additional investment partnerships. The grantor trusts are Kidd Living Trust and Thomas Living Trust. The intermediary investment partnerships are Kiddel II, Ltd. and JTOM II, Ltd.

### *The BPP Transaction Used Five Steps to Funnel Cash Payments From the Thomas and Kidd Businesses to the Thomas and Kidd Life Insurance Policies*

26. On the surface, the BPPs appear to protect the Thomas and Kidd businesses from various risks. In reality, these policies were merely a conduit used to funnel income from those businesses to offshore entities in a scheme to avoid paying taxes due on that income. Thomas and Kidd used these policies to funnel cash into their cash-value life policies. In his expert report and during his testimony, the Government's expert Bruce Dubinsky described the following six steps:

Step One: The Thomas and Kidd Businesses Transfer $4.5 million to KOFS Group

27.  The 2006 BPP transaction began with yet another intermediary entity—KOFS Group. Instead of transferring the BPP "premiums" directly to Fidelity and Citadel, the Plaintiff businesses transferred $4.5 million of premiums to KOFS Group.

Step Two: KOFS Group Transfers $4.5 Million to Fidelity and Citadel

28.  Immediately after receiving the $4.5 million for all the BPP premiums from the Thomas and Kidd businesses, KOFS Group transferred that $4.5 million to Fidelity and Citadel.

29.  Fidelity and Citadel accepted that payment as premiums for separate BPPs providing the Thomas and Kidd businesses with various sorts of coverage against remote and implausible risks.

Step Three: Fidelity and Citadel Execute Reinsurance Agreements with Yield Enhancement Company

30.  Fidelity and Citadel then executed purported "reinsurance" agreements with Yield Enhancement Company ("YEC"), another of the Alliance group entities.  These agreements purported to transfer responsibility for a portion of the BPP coverage amounts.

31.  Fidelity's agreement provided that YEC would assume responsibility for 85 percent of BPP coverage.

32.  In return for allegedly assuming risk responsibility, the agreement provides that YEC would receive consideration equal to 85 percent of all BPP premiums, minus "any claim" paid by Fidelity:

> Consideration is equal to 85% of the gross premium received by
> Reinsurer with respect to the Business Protection Policy for which
> a guaranty is obtained less a USD$250.00 administrative fee for

each policy, less any Claim Amount paid by FIC, plus any interest
earnings on such premiums during the term of the Agreement.

33. Claim amount is defined by the agreement as "all amounts paid by FIC on claims
made under the policy."

34. Citadel's agreement with YEC was identical to Fidelity's agreement except that 85
percent is replaced with 83 percent.

35. Fidelity retained 15 percent of the premiums paid and Citadel 17 percent as their
fees.

Step Four: YEC Executes "Subscription" Agreements with the Thomas and Kidd Life
Insurance Segregated Accounts

36. After Fidelity and Citadel executed reinsurance agreements with YEC, YEC
immediately executed "subscription agreements" with the segregated accounts, which held the
cash value of the Thomas and Kidd life insurance policies.

37. In return for access to the segregated accounts' assets to pay BPP claims, YEC agreed
to give the accounts all remaining BPP premiums after payment of claims and administrative
fees.

Step Five: Fidelity and Citadel Transfer $3.86 Million to the Segregated Accounts

38. At the end of the BPPs' one-year term, Fidelity and Citadel issued cash notices to all
of the life policy segregated accounts. These notices stated that a total of $3.86 million of the
original $4.5 million of BPP payments was to be transferred to the segregated accounts.

39. Despite execution of reinsurance agreements with YEC, no money was actually
transferred to any entity named YEC. Instead, cash notices in December 2007 indicate that the
BPP payments were transferred directly from Fidelity and Citadel to J. Thomas LLC and L&E

8

Kidd, LLC, with a direct correlation between the premium each company paid and the interest earned after deducting the 15 percent or 17 percent fee imposed by Fidelity or Citadel.

40.  These transfers were made without going through YEC.  Although the cash notices each referred to several segregated accounts, Thomas and Kidd, with their advisors, had to allocate the earnings from the seven BPPs to their five segregated accounts after they had received the money from the insurance companies.

41.  Included in each of the cash notices was a request for instructions on how each segregated account's share of the proceeds should be invested.  The remaining $730,000 of the original $4.5 million of BPP payments was withheld by Fidelity and Citadel as fee payments, i.e., their respective 15 percent and 17 percent of the premiums paid.  These fees were much smaller than the tax benefit derived from deducting the BPP payments as insurance expenses, i.e., the deduction of the $4.5 million in premiums paid as "ordinary and necessary business expenses." Accordingly, $730,000 was spent to acquire a $4.5 million reduction in otherwise taxable income in the United States and to funnel the remaining $3.86 million ($3.77 million plus interest) into offshore life insurance policies.

Step Six: Thomas and Kidd Withdraw the BPP Proceeds as Policy Loans

42.  Within a day after the $3.86 million of BPP premiums were transferred into the segregated accounts, Thomas and Kidd withdrew the premiums as policy loans.  They issued a letter with detailed instructions to withdraw all the BPP premiums as loans.

43.  The letter further detailed particular Bear Sterns accounts into which the loan proceeds were to be transferred.

**The Royalty Transfer**

44. The BPP transactions were not the only method Thomas and Kidd used to avoid paying taxes. They also used a transaction involving oil and gas royalty interests.

45. The royalty transaction involved overriding royalty interests. Thomas & Kidd Oil Production, Ltd. owns a number of working interests in oil and gas properties.

46. As part of the royalty transaction, overriding royalty interests were carved out of these working interests and transferred to the segregated accounts owned by the Thomas and Kidd life insurance policies.

47. A small portion of the royalty income was eventually brought back on shore via annuity payments to Thomas and Kidd, but only after a three-year deferral while no taxes were paid on this income.

48. The greater portion of the income shifted offshore was not taxed and continued to accumulate and be available for tax-free policy loans.

49. As described by Dubinsky, executing the royalty transaction included four steps.

Step One: Thomas and Kidd Create Two Limited Liability Companies

50. In January 2006, Thomas and Kidd created two limited liability companies: Thomas & Kidd Royalty-Nevada LLC and Thomas & Kidd Royalty-Nevis LLC.

51. Both of these LLCs were owned by Kiddel II and JTOM II, the same entities that owned Thomas & Kidd Oil Production, Ltd. Kiddel II and JTOM II directly owned 100 percent of the Nevis entity, and the Nevis entity directly owned 100 percent of Nevada entity.

52. The Nevis entity acted only as a foreign intermediary.

Step Two: Overriding Royalty Income Interests Were Carved Out of Thomas & Kidd Oil
Production and Assigned to Thomas & Kidd Royalty-Nevada

53.   Immediately after creating the royalty LLCs, Thomas & Kidd Oil Production
assigned overriding royalty income interests to Thomas & Kidd Royalty-Nevada.  This
assignment gave Royalty-Nevada the right to receive just over 31 percent of the income
generated by the oil and gas working interests owned by Thomas & Kidd Oil Production.

Step Three: Thomas & Kidd Royalty-Nevada Is Transferred to Thomas & Kidd Royalty-
Nevis

54.   This meaningless step meant that the Nevis entity indirectly owned the overriding
royalties, which were its only assets.

Step Four: Thomas & Kidd Royalty-Nevis Is Transferred to the Life Insurance Segregated
Accounts

55.   Kiddel II and JTOM II then transferred Thomas & Kidd Royalty-Nevis, and the
royalties it owned through the Nevada entity, to the life insurance segregated accounts in return
for two annuities, one for Kiddel II and one for JTOM II.  The Kiddel II annuity paid $192,810
per year for the remainder of Kidd's life, and the JTOM II annuity paid $178,579 per year for the
remainder of Thomas's life.  The annuity payments, however, were deferred.  Payments did not
begin until January 2009.

56.   The value of the exchanged royalty interests is unclear.  Thomas and Kidd's
accountant, Henderson, valued one-half of the royalty interests, i.e., half of the total value for
Thomas and half for Kidd, at $1,261,500 by applying certain "discounts" to the initial value of
the production supplied to him by Plaintiffs themselves.  Subsequently, Plaintiffs' experts, W.D.

11

Harris, III and Peter Phalon, valued the same half interests in the same royalties at $1,001,000—a 26 percent difference.

57. Nevertheless, Henderson's valuation was used for the exchange in 2006. Henderson's valuation was not arm's length. Henderson served on both sides of the royalty transaction. On one side of the transaction, he was the long-time accountant for Thomas, Kidd, and Thomas & Kidd Oil Production. On the other side, he was the "manager" for the LLCs that owned the life insurance policies. Other evidence shows that he was also investment manager for the segregated accounts that allegedly purchased the royalty interests. Resolutions by L&E Kidd LLC and J. Thomas LLC appoint Henderson's company, IBS, as "investment manager" of the LLCs that exchanged the life annuities for the royalty interests.

58. Despite the royalty transfer, nothing about the operation of the underlying oil and gas interests changed. Thomas testified that he supervised the Thomas and Kidd drilling and production operations. He explained that Thomas & Kidd Oil Production owned the working oil and gas interests and that Delta Oil & Gas operated the interests.

59. The BPP transaction and the royalty transaction bear similarities. Both transactions accomplish a transfer of assets into cash-value life insurance policies. Both transactions represent an internal shifting of assets from one set of entities owned and controlled by Thomas and Kidd to another set of entities owned and controlled by Thomas and Kidd. The tax benefits sought in this case require arm's-length transfers to third parties, but no third parties exist on either end of the BPP or royalty transactions.

**Legal Opinions and Warnings**

60. During the BPP presentation given to Henderson, Donaldson discussed obtaining a "Substantial Authority Tax Opinion." Consistent with that presentation, Thomas and Kidd obtained multiple tax opinion letters from multiple lawyers. These letters were obtained for use as a defense to tax penalties that the IRS might impose. Yet, the process for obtaining those legal opinions provided Thomas and Kidd with multiple warnings about the legality of their transactions.

### *Thomas and Kidd's Tax Advisors Have Suffered From Financial Conflicts, Refused to Update BPP Opinions, and Have Withdrawn BPP Opinions*

61. The professionals that Thomas and Kidd allegedly relied on for tax advice provided multiple warnings about the legality of BPP transactions: two suffered from financial conflicts and one withdrew his opinion, citing misrepresented facts.

<u>Lustig and Henderson Suffered From Financial Conflicts</u>

62. Through all of the years that Thomas and Kidd executed offshore transactions, they were advised by their accountant, Henderson, and their lawyer, Theodore Lustig.

63. Henderson and Lustig coordinated the creation of offshore entities, the execution of offshore transfers, and the investment of offshore funds. Their compensation, however, did not come from their clients. Instead, it came from Fidelity and Citadel. To promote their offshore transactions, Fidelity and Citadel used the marketing entity Foster & Dunhill. Fidelity and Citadel paid Foster a commission percentage of all funds that Foster clients contributed into Fidelity and Citadel products. Foster paid part of its commission to various client representatives. Henderson and Lustig received those Foster commissions.

13

64. Lustig, for example, received a commission equal to 3 percent of all BPP premiums paid by his clients, including the Thomas and Kidd businesses. His commission for Flexible Premiums Variable Annuity policies equaled over 2.5 percent. Lustig's compensation records indicate that, for 2006 alone, he received $490,000 of commissions from Foster. Between 2002 and 2007, Lustig received over $2.5 million in commissions from Foster. Before he received fees from Foster & Dunhill, Lustig disclosed his Foster fee arrangement to Thomas and Kidd.

65. Henderson received similar commissions. Henderson testified that he received approximately 2.25 percent of all premiums paid by his clients for BPPs and life insurance policies. Henderson's compensation records indicate that, between 2002 and 2009, he received over $2.5 million in commissions from Foster. He disclosed all of these commissions to Thomas and Kidd. Henderson also sold various contact names and Power Point templates to Foster for $50,000. Some of those Power Point templates related to BPPs.

## Arthur Boelter Backed Out of An Update of His Initial Tax Opinion

66. The first lawyer that issued a written tax opinion to Thomas and Kidd on the BPP transaction was Arthur Boelter. Boelter issued an opinion for the 2001 tax year, the first year that they executed a BPP transaction.

67. The following year, however, Boelter did not issue an opinion. Notes produced by Plaintiffs indicate that Boelter refused to issue more opinions: "Art backed out on an update."

## Brian Casey Withdrew His Tax Opinion Based on Factual Misrepresentations

68. For the 2002 tax year, Brian Casey, a lawyer, issued a tax opinion on the BPP transaction to Thomas and Kidd. By 2003, however, Casey had moved his law practice to Lord Bissell & Brook. His new law firm required opinions on transactions like the BPP transactions

14

to be reviewed by a committee of other lawyers.  Emails between Casey and Crithfield reveal that

Lord Bissell had many questions about the BPP transaction that Crithfield could not answer.  For

example, the review committee questioned the "apparent disincentive for BPP insureds to file

claims for losses that are covered by the BPP."  Another member of the committee questioned

why Fidelity's financial statements reflected inventory accounting principles instead of insurance

accounting principles.  Unable to obtain answers to his questions about claims and risk, Casey

questioned the accuracy of assumptions and representations that he relied on for his first BPP

opinion.

     69.  In September 2003, Casey withdrew his 2002 BPP opinion.  He sent a letter directly

to Thomas and Kidd stating that material facts about the BPPs were misrepresented to him:

> There are a number of respects in which material facts regarding
> the BP Policy and the related reinsurance and guarantee structure
> are not as they have been represented to us.  Most importantly,
> perhaps, it was represented to us that the Company retained all
> liability for the first five percent (5%) of any losses under the BP
> Policy, and that an independent third party reinsurer (the
> "Reinsurer") retained all liability for twenty percent (20%) of any
> losses in excess of the first five percent (5%).  As we now
> understand it, these representations were not true—all or nearly all
> losses under the BP Policy were intended to be funded by the
> limited liability companies (the "LLCs") in which insurance
> premiums paid for the Select Investment Plus Variable Life
> Insurance Policies (the "Life Policies") issued by the Company to
> J. Thomas, LLC and L&E Kidd, LLC were invested.  This
> circumstance provides the Taxpayer with an incentive not to file
> claims for losses covered under the BP Policy, with the result that
> BP Policy lacks sufficient substance to support the Opinion.

     70.  Casey's withdrawal did not concern Kidd because he believed that he could always

find another lawyer.

<u>Jenkens & Gilchrist Refused to Issue a BPP Opinion for the 2006 Tax Year, and Its
Opinion on the Royalty Transactions Relies On False Information</u>

71. Thomas and Kidd found their next lawyers at the now-defunct law firm of Jenkens &
Gilchrist. Jenkens attorneys Jason Flaherty and Michael Cook prepared BPP opinions for the
2003-2005 tax years. They did not issue an opinion on the BPP transaction for 2006.

72. Jenkens's failure to issue a BPP opinion for the 2006 tax year relates to concerns
raised by Flaherty. In an email to Lustig, Flaherty aired concerns he had about informal
"linkage" between clients' BPPs and life policies. It appears that Flaherty was concerned that
risk was not distributed via the subscription agreements with YEC. Ultimately, Jenkens advised
Fidelity and Citadel about the risk distribution issue and decided that it had become a material
advisor that could no longer issue opinions on the BPP transaction.

73. For purposes of its tax opinion on the royalty transaction, Jenkens relied on
inaccurate factual representations.

74. The Thomas and Kidd businesses did not fully or accurately disclose to Jenkens the
facts relevant to the tax treatment of the royalty transactions.

75. Moreover, Jenkens never verified the representations it was given. It never explored
whether control of the royalty interests and the income they produced remained firmly with
Thomas and Kidd via the letters of wishes that conveyed their directions.

<u>Martin Van Brauman Based His 2006 BPP Opinion on Three Key Assumptions</u>

76. For the 2006 tax year, Thomas and Kidd turned to yet another lawyer, Martin Van
Brauman. Van Brauman issued them an opinion on the BPP transaction for the 2006 tax year.
Van Brauman's opinion relies on three key factual assumptions:

16

- Each of the risks covered by the Business Risk Policies issued to KOFS Group, LLC are genuine and material risks of the businesses;

- There is no arrangement, plan, contract, or agreement that exists between the owners of any insurance policy and Citadel or Fidelity linking reserves of any particular Business Risk Policy, and Citadel and Fidelity, in their sole discretion, can use reserves in the Guaranty Fund to cover losses on the Business Risk Policies;

- The coverages under the Business Risk Policies are similar to those under policies of insurance that are currently available from other insurers, the premiums are determined under valid and proper actuarial principles, and the premiums are determined at arm's length and are at fair market rates approximately equal to what other insurers would typically charge.

77. Van Brauman did not attempt to verify the accuracy of the above representations.

78. The above factual representations are false.

In Addition to Warnings From Withdrawing Lawyers, Thomas and Kidd's Personal Lawyer Received Other Warnings Related to the BPP Transaction

79. In addition to the concerns raised by opinion writers, Thomas and Kidd's personal lawyer, Lustig, considered additional red flags about the legality of BPPs.

80. In November 2005, Lustig forwarded an email to lawyers with Jenkens & Gilchrist. The article, titled "Stupid Captive Tricks," described illegal tax structures that attempt to create insurance premium deductions through self-insurance arrangements. The author provides four words of advice for taxpayers that create the described transaction: "Don't drop the soap." He stresses that the tax scheme was "amazing blatant criminal tax evasion" that is "detached from tax reality."

81. Another article forwarded by Lustig in November 2005 discusses an illegal tax shelter involving cash-value life insurance policies. The marketers of this scheme "promise that the insured can pay a premium to the insurance company, take a business deduction for it, and

17

then at the end of the policy term recapture the premium inside a cash-value life insurance product." The author warned that the "IRS is examining . . . some of the more heavily-marketed arrangements and we would not be surprised to see them soon specifically designated as illegal tax shelters."

82. Finally, Thomas, Kidd, and Greg Thomas[1] never read any of the tax opinions.

## CONCLUSIONS OF LAW

The legal conclusions in this case turn on one fact:  John Thomas and Lee Kidd owned and controlled the assets at issue before the transactions and after the transactions.  In substance, the BPP premium payments and royalty transfers were distributions from the Thomas and Kidd businesses to Thomas and Kidd and their families.  These distributions to themselves do not qualify as tax deductible business expenses or valid transfers of income to third parties.

**The BPP Premiums Do Not Qualify as Business Expenses Under 26 U.S.C. § 162**

1. Deductions are a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to them. *INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992).  The taxpayers in this case seek to deduct the BPP "premiums" they transferred offshore, but they cannot prove that the payments qualify as deductions under any statute.

2. Plaintiffs claim that the BPP payments are business expenses, but the payments do not meet the requirements of 26 U.S.C. § 162.  Section 162(a) allows businesses to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any

---

[1]Greg Thomas, John Thomas's son, was involved in the management of the Thomas and Kidd businesses during the relevant time.

trade or business." Courts generally recognize five requirements in § 162. The expense must (1) be paid or incurred during the taxable year, (2) be for carrying on a trade or business, (3) be an expense, (4) be a necessary expense, and (5) be an ordinary expense. *Comm'r v. Lincoln Savs. & Loan Ass'n*, 403 U.S. 345, 352 (1971); *Tulia Feedlot, Inc. v. United States*, 513 F.2d 800, 804 (5th Cir. 1975). The BPP payments fail four of the five requirements.

### Thomas and Kidd Executed the BPP Transaction for Tax and Estate Planning Purposes, Not for Carrying on a Trade or Business

3. The Fifth Circuit explained in *Green v. Commissioner* that "[e]xpenditures may only be deducted under § 162 'if the facts and the circumstances indicate that the taxpayer made them primarily in furtherance of a bona fide profit objective independent of tax consequences.'" 507 F.3d 857, 871 (5th Cir. 2007) (quoting *Copeland v. Comm'r*, 290 F.3d 326, 335 (5th Cir. 2002)). Payments made to further an owner's personal estate and tax planning do not qualify as payments made for carrying on a trade or business. *See Steere Tank Lines, Inc. v. United States*, 577 F.2d 279, 283 (5th Cir. 1978).

4. For example, in *Steere Tank Lines, Inc. v. United States*, the Fifth Circuit affirmed the trial court's holding that alleged payments were not deductible under § 162. 577 F.2d 279 (5th Cir. 1978). The taxpayer in that case, Steere Tank Lines, paid over $200,000 into a "premium contract account" as part of an alleged insurance policy. Claims against the policy would be paid from that account. The premium account was managed by an entity owned by two trusts. Those trusts were established for the benefit of the children of Bruce and David Steere, the owners of Steere Tank Lines. Any amount left in the premium account after six years would be returned to Steere Tank Lines. The trial court rejected this alleged insurance arrangement as

19

personal estate planning: "In truth, the plan more closely approximates a clever estate planning device." *Steere Tank Lines, Inc. v. United States*, No. CA-3-75-0712-D, 1976 U.S. Dist. LEXIS 14629, at *9 (N.D. Tex. June 15, 1976). The Fifth Circuit agreed, holding that the arrangement was not a true insurance contract. *Steere Tank Lines*, 577 F.2d at 280.

5. As in *Steere*, the BPP arrangement in this case is not true insurance; it is disguised estate planning. The BPP payments were not paid to a third-party insurer but were instead funneled to cash-value life policies purchased by Thomas and Kidd through their LLCs. Those policies, as in *Steere*, were owned by trusts that benefitted the Thomas and Kidd children. Thomas and Kidd did not further their businesses by shifting business risks to a third-party insurer. Rather, they contributed cash to personal life policies. From these policies, they accessed the contributed cash through policy loans. Taxes were never paid on this money, which was income to the Thomas and Kidd businesses.

### The BPP Payments Were Distributions, Not Expenses

6. In addition to the payment being made to further a business, the payment must qualify as an expense. In other words, the business must actually spend money on some business activity. Distributions to company executives do not qualify as expenses. *V.R. DeAngelis M.D.P.C. v. Comm'r*, 94 T.C.M. (CCH) 526, at *66-67 (2007); *see Greensboro Pathology Assocs., P.A. v. United States*, 698 F.2d 1196, 1201 (Fed. Cir. 1982) ("Of course, in any instance where a company maintains total control of and retains all rights to the plan's funds, no deduction is allowed because the company has not in reality spent the money.").

7. For example, in *Curcio v. Commissioner*, the Second Circuit held that alleged insurance expenses were not deductible expenses under § 162. 689 F.3d 217 (2d Cir. 2012).

Instead of business expenses, payments were disguised contributions to personal cash-value life policies. The taxpayers in that case owned four small businesses. Those businesses enrolled in purported life insurance plans for their employees. Under the plan, the businesses would pay the premiums of cash-value life insurance policies that covered the businesses' employees. The owners, however, were also covered by the plans. The businesses deducted the life insurance premiums as business expenses, but the Second Circuit held that the premium payments did not qualify under § 162. Instead of business expenses, the payments were cash distributions to the businesses' owners:

> The contributions were a mechanism by which petitioners could divert company profits, tax-free, to themselves, under the guise of cash-laden insurance policies that were purportedly for the benefit of the businesses, but were actually for petitioners' personal gain.

*Id.* at 226.

8. Just like the payments in *Curcio*, the BPP payments in this case were not business expenses; they were "a mechanism by which [Thomas and Kidd] could divert company profits, tax-free, to themselves, under the guise of cash-laden insurance policies." This fact is demonstrated by the undisputed flow of BPP premiums from the Thomas and Kidd businesses to the Thomas and Kidd life insurance policies, which Thomas and Kidd readily accessed through policy loans.

### The BPP Payments Were Not Necessary

9. For an expense to be necessary, the expense must be "appropriate and helpful" for the development of the taxpayer's business. *Id.* at 223 (quoting *INDOPCO*, 503 U.S. at 85). Courts have held that insurance premiums can be a necessary business expense, but a transaction must

21

include the following three elements to qualify as insurance: (1) risk, (2) shifting of risk, and

(3) distribution of risk. *Helvering v. Le Gierse*, 312 U.S. 531, 539 (1941); *Beech Aircraft Corp.*

*v. United States*, 797 F.2d 920, 922 (10th Cir. 1986); *see Steere Tank Lines*, 577 F.2d at 280 (risk

shifting or risk distribution is one of the requisites of a true insurance contract). The BPP

program in this case does not qualify as insurance.

### The BPPs Did Not Cover Risks

10. The BPP premiums were based on arbitrarily determined budgets, not on genuine

risk. Even though the coverages purchased by particular Thomas and Kidd business entities were

adjusted, the final premium paid by all of the entities matched the total premium in the budget for

all of those same entities, $4.5 million. Budgets for insurance were made based on the

purchasers' available cash flow, not protection of the purchaser against risks. This available cash

approach led to coverage driven by a predetermined premium, not a premium driven by

predetermined coverages. In other words, Fidelity and Citadel tailored the coverages to meet the

amount Thomas and Kidd wanted to contribute to their cash-value policies. The total premiums

equaled the total funds they wanted to transfer offshore. Consideration of protection against risks

was not part of the equation. The Thomas and Kidd businesses did face real risks, but those real

risks were covered by real insurance policies and not the BPP transaction.

### The BPPs Did Not Shift Risk

11. Even if the BPPs covered real risks, those risks must have been transferred to a third

party for the insurance to be real. Self-insurance does not qualify as a deductible expense under

§ 162. *Clougherty Packing Co. v. Comm'r*, 811 F.2d 1297, 1300 (9th Cir. 1987); *Beech Aircraft*,

797 at 922 ("[F]unds set aside as reserves against contingent losses, as a plan of 'self-insurance,'

where there is no real transfer of risk to a separate entity, are not deemed to be insurance premiums and are therefore not deductible as an ordinary business expense.").

12.   For example, the Fifth Circuit held in *Steere Tank Lines* that Steere's insurance arrangement amounted to self-insurance because the "premium contract account could be used only to pay losses suffered by Steere or its owner-lessors." *Steere Tank Lines*, 577 F.2d at 280. In effect, "Steere's losses were to be paid only out of a fund made up of premiums Steere had paid." *Id.* Determining that no risk had been shifted, the Fifth Circuit affirmed denial of the § 162 deduction. *Id.* at 283.

13.   All of the potential losses of the Thomas and Kidd businesses, like those in *Steere*, were covered by the businesses' own funds.   Through the reinsurance agreement and subscription agreements, all risk of loss was transferred to the segregated accounts, which were in turn owned or controlled by Thomas and Kidd or their children.   The agreements' plain language shows that Fidelity and Citadel retained no risk of loss.   The complicated BPP structure boils down to self-insurance.   Only Thomas's and Kidd's BPP premiums and segregated accounts could be used to pay Thomas's and Kidd's BPP claims.   No risk was shifted to a third party.

14.   Some courts have held that captive insurance arrangements can qualify as insurance. *See, e.g., Amerco, Inc. v. Comm'r*, 979 F.2d 162, 168 (9th Cir. 1992); *Humana, Inc. v. Comm'r*, 881 F.2d 247, 257 (6th Cir. 1989).   But one key element must exist: a captive insurance company.   A captive insurance company is owned by some of the entities it insures.   The owners can deduct premiums paid to this captive insurance company if that captive does "substantial unrelated business." *Amerco*, 979 F.2d at 168.   In other words, the captive cannot insure only its owners.   It must operate as a legitimate, separate insurance company.

15. Plaintiffs do not own an insurance company.  To the contrary, they assert that they shifted risk to Fidelity and Citadel, two companies in which they had no ownership interest. Therefore, the BPP arrangement is not captive insurance.

The BPPs Did Not Distribute Risk

16. Even if risk had been shifted, Plaintiffs must also show that risk was distributed among a group of separate entities.

17. No risk distribution occurred in this case.  To the extent risk existed, it started with Thomas and Kidd and ended with Thomas and Kidd.  The segregated accounts attached to the Thomas and Kidd life insurance policies were not pooled with other clients' segregated accounts. The Thomas and Kidd accounts could be used only to pay BPP claims from the Thomas and Kidd BPPs.  Therefore, no risk was distributed.

The BPPs Were Not Ordinary

18. To qualify as a § 162 deduction, insurance payments "must be ordinary, not in the sense that they are habitually or normally made by a single taxpayer, but in the sense that they are of a known type and commonly made, in some circumstances, by persons in the type of business carried on by the taxpayer." *Tulia Feedlot*, 513 F.2d at 804.

19. The BPP program was neither known nor common in any business, let alone in the oil and gas business.

20. The insurance consulting firm, Ashton Tiffany ("Ashton"), advising Fidelity immediately recognized that its BPP was unknown and uncommon.  Ashton refused to sign a letter stating that the method it used to calculate the BPP premiums was comparable to methods used by other insurance companies.  Ashton could not compare its method for calculating BPP

24

premiums with those of other insurance companies because it knew of no other insurance company that offered a policy similar to BPPs.

**Income From the Transferred Royalty Interests Should Be Assigned to Thomas & Kidd Oil Production**

21. The assignment-of-income doctrine applies to income from property that the taxpayer unsuccessfully attempts to transfer to a different taxpayer. *See Moore v. Thomas*, 145 F.2d 813 (5th Cir. 1944). The assignment-of-income doctrine exists to prevent a taxpayer from avoiding tax on income it earned by transferring the right to receive such income to another taxpayer, typically a taxpayer that would pay less or even no tax on the assigned income. *See Comm'r v. Earl*, 281 U.S. 111, 115 (1930) (holding that "tax could not be escaped by anticipatory arrangements and contracts however skillfully devised" to prevent income from vesting in the taxpayer who earned it).

### *Plaintiffs Retained Beneficial Ownership of the Royalty Interests*

22. To determine the true owner of income-producing property, it is necessary to identify the person with "beneficial ownership, rather than mere legal title," which is the person with the ability to command the property or enjoy its economic benefits. *Chu v. Comm'r*, 72 T.C.M. (CCH) 1519, at *9 (1996) (citing *Hang v. Comm'r*, 95 T.C. 74, 80 (1990)).

23. Transactions structured as purported sales but that do not shift ownership rights and ones in which the transferor retains substantial dominion and control are not treated as valid transfers. *See Nat'l Lead Co. v. Comm'r*, 336 F.2d 134, 140-41 (2d Cir. 1964).

24. When all of the entities involved are directly or indirectly controlled by the taxpayers, courts "closely scrutinize all transactions in order to determine their substance." *Yeoham Est. v. Comm'r*, 52 T.C.M. (CCH) 451, at *12 (1987).

25. To be a valid transfer or property, there must be a significant change in the economic relationship of the taxpayer to the property. *See Zmuda v. Comm'r*, 731 F.2d 1417, 1420 (9th Cir. 1984); *see Ideal Tool & Die Co. v. Comm'r*, 19 T.C.M. (CCH) 502 (1960). There is no significant change in the taxpayer's economic relationship to the property if the "documents purportedly creating the organizations left the taxpayers in exactly the same relationship to the properties after the 'transfers' that they were in prior to such transfers." *Yeoham Est.*, 52 T.C.M. (CCH) at *13; *see Chase v. Comm'r*, 59 T.C.M. 261, at *12-13 (1990).

26. The assignment-of-income doctrine applies if, despite the taxpayer's purported assignment, the income nonetheless wends its way to the taxpayer through any number of intermediary assignees. *See Benningfield v. Comm'r*, 81 T.C. 408, 418-19 (1983). It would be improper to condone a transaction "by which the fruits are attributed to a different tree from that on which they grew." *Earl*, 281 U.S. at 115.

27. Retention by the taxpayer of risk of loss and full control of the property, such as discretion over the distribution or investment of the assets, obviates any effective transfer. *See Applestein Est. v. Comm'r*, 80 T.C. 331, 346-47 & 349-50 (1983).

28. The economic relationship between Plaintiffs and Thomas and Kidd was identical at the beginning and the end of the transaction. JTOM II and Kiddel II owned the working interests from which the overriding royalty interests were created. After the transfers from Thomas & Kidd Oil Production through all of the entities, the private annuities were payable to the same

26

entities that owned Thomas & Kidd Oil Production, JTOM II and Kiddel II.  The transfer merely removes income from one pocket and puts it into another.  The economic benefits of the royalty interests did not change with the alleged assignment, and the transaction should not be allowed to transfer taxable income away from Plaintiffs.

### *Thomas & Kidd Oil Production Retained Control Over Activities Generating Royalty Income*

29.  The assignment-of-income doctrine applies if the taxpayer continues to exercise significant control over the activities generating the income and thus precludes the assignee from exercising the control.  *See C.M. Thibodaux Co., Ltd. v. United States*, 915 F.2d 992, 994-95 (5th Cir. 1990).

30. Even if the assignment constitutes a property transfer under state law, the income remains with the transferor if the taxpayer retains significant control over the assets generating those payments. *See id.* at 996.

31.  The income from the allegedly transferred royalty interests should be assigned to Thomas & Kidd Oil Production.  The transaction involved a variety of alleged transfers among entities owned and controlled by Thomas and Kidd, ending with cash-value life insurance policies also under their control.  Once the income was in those life polices, they continued to control how the royalty income was used and invested through the letters of wishes.  Thomas admitted that the royalty transaction was done for estate planning purposes and that operation of the properties did not change after assignment of the royalty interests.

32.  The alleged sale was not an arm's-length transaction.  Plaintiffs' own expert determined that the value of the royalty interests was overstated by approximately 26 percent.

27

The life policy segregated accounts agreed to overpay for the annuities because the value never really mattered. The sale was not truly arm's length, and Thomas's and Kidd's accountant's overstated value was accepted without question because it was just one step in the overall scheme to avoid taxes.

33. The income from the royalty interests should remain with Thomas & Kidd Oil Production and not the alleged transferees, who neither received the benefits of the income nor exercised control over its production.

**The BPP and Royalty Transactions Lack Economic Substance**

34. In addition to failing § 162 and assignment-of-income principles, the transactions at issue lack economic substance.

35. Under the economic-substance doctrine, transactions that are invented to create tax deductions and otherwise have no economic substance, even though formally complying with the letter of the Internal Revenue Code, will not be recognized. This principle originates in the Supreme Court's holding in *Gregory v. Helvering*. 293 U.S. 465 (1935). Later, in *Frank Lyon Company v. United States*, the Supreme Court recognized two areas of inquiry to determine whether a transaction should be respected for tax purposes: first, whether the taxpayer was motivated by any business purpose other than obtaining tax benefits, and second, whether the transaction lacked economic substance. 435 U.S. 561, 583-84 (1978).

36. In *Klamath Strategic Fund v. United States*, the Fifth Circuit established a rigorous test for economic substance that a taxpayer must satisfy before its transaction will be respected. 568 F.3d 537, 545 (5th Cir. 2009). Factors to consider include "whether the transaction (1) has economic substance compelled by business or regulatory realities, (2) is imbued with

independent tax considerations, and (3) is not shaped totally by tax avoidance features.
Importantly, these factors are phrased in the conjunctive, meaning that the absence of any one of
them will render the transaction void for tax purposes." *Id.* at 544 (citation omitted). The Fifth
Circuit further emphasized "that when applying the economic substance doctrine, the proper
focus is on the particular transaction that gives rise to the tax benefit, not collateral transactions
that do not produce tax benefits." *Id.* at 545. "Thus, if a transaction lacks economic substance
compelled by business or regulatory realities, the transaction must be disregarded even if the
taxpayers profess a genuine business purpose without tax-avoidance motivations." *Id.* at 544.

37. The BPP transactions and the royalty transfers both fail to satisfy the factors of the
Fifth Circuit's economic-substance test, and both should be disregarded for tax purposes.

38. The purposes of the BPP transactions included tax reduction and protection of assets
from creditors. The BPP transactions bear no resemblance to real insurance. Plaintiffs produced
no credible evidence that the risks of the Thomas and Kidd businesses were ever analyzed or
quantified. The process of determining BPP premiums focused on budgets instead of risks. The
flow of BPP premiums into segregated accounts reflects investments, not expenditures.

39. The YEC reinsurance gambit further evinces the lack of economic substance in the
BPP tax shelter. There is no evidence that anyone ever saw the YEC limited partnership
agreement, no one could identify YEC's general partner—IMNIHAAB, and no one could
provide the capital contributions made by the limited partners that would be essential before any
pro rata payments could be made. For reasons discussed above, the BPP arrangement essentially
amounts to nothing more than self-insurance and is not deductible under applicable law.

40. Likewise, nothing about the royalty transaction resembles an arm's-length transfer of assets for fair value. The evidence points to an inside transfer for tax purposes, i.e., taking money out of one pocket and putting it into another. JTOM II and Kiddel II owned the production interests carved out to create the overriding royalties, and they owned the annuities that were created from them. Thomas and Kidd controlled the cash flow at the beginning of the transaction, and they continued to do so after it was complete. Neither the control nor the benefits of the royalty interests were ever transferred.

**The 20 Percent Penalty Applies**

41. The IRS may impose a penalty equal to 20 percent of the unpaid tax for a substantial understatement of income tax or for negligence or disregard of rules or regulations. 26 U.S.C. § 6662(a), (b)(1)-(2), (c), & (d). In these consolidated cases, the IRS determined that the twenty percent substantial understatement penalty and, in the alternative, the twenty percent penalty for negligence or disregard of rules and regulations applied. There is no "stacking" of penalties, however; so the maximum penalty is 20 percent of the underpayment of tax, even if an underpayment is attributable to more than one type of misconduct. *See* Treas. Reg. § 1.6662-2(c).

> *Both the Accuracy-Related Penalty for Substantial Understatement and the Penalty for Negligence or Disregard of Rules and Regulations Apply*

42. An understatement is the excess of the amount required to be shown on the return over the amount shown as tax on the return. § 6662(d)(2). A "substantial understatement of income tax," for a corporate taxpayer, occurs if the amount of understatement exceeds the greater of (i) 10 percent of the tax required to be shown on the return or (ii) $5,000. § 6662(d)(1). The

amounts of unpaid taxes in this case are sufficient to trigger the substantial understatement penalty.

43.   Negligence "includes any failure to make a reasonable attempt to comply with the provisions of [the Internal Revenue Code]" or to exercise ordinary and reasonable care in preparing a tax return. *See* § 6662(c); Treas. Reg. § 1.6662-3(b)(1). According to the regulations, "[n]egligence is strongly indicated where . . . a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances." Treas. Reg. § 1.662-3(b)(1)(ii).

44.   Disregard of rules and regulations includes any careless, reckless, or intentional disregard of the rules and regulations relating to the Internal Revenue Code. *See* § 6662(c); Treas. Reg. § 1.6662-3(b)(2).

45.   Plaintiffs' conduct went beyond negligence and constituted an intentional attempt to shift millions of dollars offshore to avoid paying taxes on the income.

46.   The structures employed in these transactions—the allegedly deductible BPP premiums and the transfer of royalty payments to different entities under the same ultimate control of Thomas and Kidd—are blatant attempts to create tax benefits without any of the business reasons or risks that would exist in legitimate insurance or royalty interest transactions.

47.   Therefore, the 20 percent penalty applies.

***Tax Shelters***

48.   There are special rules in cases involving tax shelters, which are defined under the Internal Revenue Code as "(I) a partnership or other entity, (II) any investment plan or

arrangement, or (III) any other plan or arrangement if a significant purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax." § 6662(d)(2)(C)(ii).  If a tax shelter is involved in a case, neither the substantial authority nor the adequate disclosure/reasonable basis exceptions under § 6662(d)(2)(B) apply. § 6662(d)(2)(C)(i).  However, the reasonable cause exception under § 6664 may still apply.

49.  As described previously, the entire structure of both the BPP transaction and the alleged transfer of royalty interests to offshore entities indicates that the purpose of these transactions was the avoidance or evasion of Federal income tax.  Therefore, both of the transactions are tax shelters, and the only available defense to the penalties assessed is a showing of "reasonable cause."

### The Reasonable Cause Defense to Penalties Is Inapplicable

50.  The defense of "reasonable cause" under § 6664(c) provides an affirmative defense to the accuracy-related penalties for taxpayers who can show there was reasonable cause for their underpayment and that they acted in good faith.  26 U.S.C. § 6664(c)(1).  The determination of a taxpayer's reasonable cause and good faith is made on a case-by-case basis, taking into account all pertinent circumstances.  Treas. Reg. § 1.6664-4(b)(1).

51.  Reliance on a legal opinion cannot be reasonable and in good faith if the taxpayer fails to disclose a fact that it knows, or reasonably should know, to be relevant to the proper tax treatment of an item, or if the opinion is based on unreasonable factual and legal assumptions or unreasonably relies on the representations, statements, findings, or agreements of the taxpayer or any other person.  Treas. Reg. § 1.6664-4(c)(1)(i), (ii).

52. "Reasonable reliance" on professional advice exists only when (1) the advice itself is reasonable (in that it is based on accurate information and representations supplied by the taxpayer, reflects reasonable investigation into the transactions, and does not make unreasonable or unsupported assumptions), *see Illes v. Comm'r*, 982 F.2d 163, 164-66 (6th Cir. 1992), and (2) the taxpayer's reliance thereon is reasonable (in that the professional does not manifest a conflict of interest, and, given the taxpayer's knowledge and experience, the transactions are "too good to be true"). *See, e.g., Pasternak v. Comm'r*, 990 F.2d 893, 903 (6th Cir. 1993).

53. Through all the years that Thomas and Kidd executed offshore transactions, they were advised by their accountant, Henderson, and their lawyer, Lustig. Henderson and Lustig were the primary sources for information, especially the representations used to generate tax opinions provided on the transactions. However, neither of them was an independent source of information because they were both receiving commissions from the promoters of the scheme through Foster & Dunhill. Each of them has also participated in a BPP transaction through Foster & Dunhill to reduce his own taxes. Henderson testified that these fees were disclosed to Thomas and Kidd, so they were aware that the advice provided to them and their tax opinion writers was not independent. Lustig was also forwarding multiple emails of articles questioning these types of transactions and was aware of the risks that the transactions were being treated as improper in other cases. Accordingly, advice from Henderson and Lustig is no defense to the penalties imposed by the IRS.

54. Multiple advisors, prior to the 2006 tax year, refused to provide subsequent opinions, and one had deliberately withdrawn his opinion in a letter to Thomas and Kidd stating that facts

were misrepresented by the insurance companies involved. Those events were red flags to any conscientious taxpayer trying to comply with the law.

55. Reliance on the tax opinions in this case is flawed because the tax opinions by Jenkens & Gilchrist and Martin Van Brauman were based on the unquestioned reliance on biased representations and ignored information regarding retained control and the veracity of representations used as the basis for the opinions.

56. The attorney hired in 2006 to provide a defense to the BPP transaction was Martin Van Brauman. He was never provided with any of the previous opinions, including the withdrawn opinion, and relied on actuarial representations from Ashton Tiffany, the insurance consulting firm that—unknown to him—declined to work in the 2006 tax year because it became uncomfortable with the BPP product. Also, Van Brauman was never shown any substantive letter of wishes to determine if the representation that the insurance companies were acting in their "sole discretion" was accurate. Moreover, it is undisputed that he never attempted to verify the representations with any inquiries of his own.

57. Before its demise, Jenkens & Gilchrist had provided a letter opinion on the legitimacy of the BPP deductions for 2003 and 2005. Although it declined to furnish this service for the 2006 tax year, it provided an opinion letter to defend the transfer of the royalty interests. Yet, the firm never verified the representations it was given. It never explored whether control of the royalty interests and the income they produced remained firmly with Thomas and Kidd via the letters of wishes that conveyed their directions.

34

58. It was unreasonable, particularly for experienced businessmen like Thomas and Kidd, in the face of so much opposition to the transaction to assume that the tax treatment advertised by the promoter of the tax shelter was accurate and likely to be upheld by the IRS.

59. Accordingly, there is no reasonable cause defense to either the penalties for substantial understatement or negligence, and they are hereby sustained.

The Government shall submit a proposed judgment within 14 days of the date of this Order.

SO ORDERED.

Dated this ___16th___ day of May, 2012.

SAM R. CUMMINGS
UNITED STATES DISTRICT JUDGE